82. Stephanie Fitzgerald also had full access to the Family Court of The State of Delaware Child Support Formula Evaluation and Update, dated September 23, 2002. On page 3 of this report, Section IV paragraph 1 states:

**The minimum attribution of income shall be increased to $1300.00 per month, or the statutory minimum wage (40 hours per week) whichever is greater.**

83. On page 5 of the same report, it makes this statement:

**All unemployed or underemployed, able-bodied persons shall be attributed wages no less than $7.50 per hour for a 40-hour week, or $1300.00 per month, or the statutory minimum wage (40 hours per week), whichever is greater. Although this amount is more than the prevailing minimum wage, it is the median wage paid to retail sales persons, the most common Delaware occupation. Parents have a duty to aspire to greater than minimum earnings to support their children. This presumption may be rebutted where a person is employed on a full time basis at a position that commensurate with his/ her skills, education and training.**

84. Page 4 Section 2 of the same report makes this statement:

**Underlying the Delaware Child Support Formula is the concept that both parents are responsible for the support of their children. An individual cannot, by voluntary unemployment or underemployment, shift the burden of support to the other parent. As to the method of attribution, an individual's "value as a homemaker" has been eliminated as a basis of attribution............the court has the benefit of statistical wage information for non-appearing parties; but where no better information exist, the non-appearing party will be assessed with at least the same amount of income as the appearing party.**

85. Stephanie Fitzgerald was fully aware of this information, but chose to ignore Plaintiff's civil rights, which makes her one of the direct causes of injury and causes for relief.

86. The Legal definition of peonage: " A condition of compulsory service or labor performed by one person, against his will, for the benefit of another person due to force, threats, intimidation or other similar means of coercion and compulsion directed against him."

87. The Plaintiff earns $19.31 per hour. The Plaintiff's earnings for a 40-hour workweek is $772.40. If we take that figure and multiply that by 52 weeks, then that would get an annual salary of $40,164.80, based on 2080 hours. (52x40). Anything over that annual salary is overtime. Overtime is not guaranteed, but forcing the Plaintiff to continue working above his capacity is a violation of the 13th amendment.

88. **The Thirteenth Amendment** - " Neither slavery nor involuntary servitude, except as punishment for a crime whereof the party shall have been duly

convicted, shall exist within the United States, or any place subject to their jurisdiction."

89.**The Fourth Amendment** - " The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

90. The Plaintiff did get his request to have his case heard in Family Court by a commissioner. This case was scheduled for April 12, 2004. Commissioner Martha Sackovich was presiding over this proceeding.

91. The Plaintiff was hoping that this hearing would vindicate him, but it did not prove to be the case.

92. The Defendant, Christopher Spizzirri was prosecuting the case for Denise Lewis and the Delaware Division of Child Support Enforcement. Though he had no knowledge of the facts of the case at hand, as required by the Federal Rules of Civil Procedure 602& 603, he represented Denise Lewis at the hearing.

93. Mr. Spizzirri made the request that the court reward Denise Lewis child support based on the Melson Formula. The Plaintiff protested, stating that he always supported his son, even though he was not living with him, and the Plaintiff has the documentation to prove it. Mr. Spizzirri questioned the Plaintiff concerning what support he was providing.

94. The Plaintiff immediately provided proof by submitting to the court, cancelled cashiers checks for day-care and cashiers checks for Denise Lewis' primary home expenses, including food. The Plaintiff also presented proof that he has maintained insurance on Denise Lewis since July 1, 2000 and on Daniel Joynes since his birth. The Plaintiff also provided his tax return showing the recipient of daycare expenses paid. When the time came for the Plaintiff to cross-examine Denise Lewis, he asked if he had continually provided care for the child. Under oath, Denise admitted yes.

95. To suppress Plaintiff's questions, Christopher Spizzirri objected, saying that the questioning was irrelevant to the case. The Plaintiff answered that it was relevant because the Division of Child Support Enforcement made an accusation that I failed to support, and he wanted to prove that he never negated his responsibility. The Honorable Martha Sackovich overruled the Attorney General.

96. However, despite proving that the Plaintiff never negated his responsibility to support, the commissioner found that because the Plaintiff is the father of Daniel and because he is married to Denise, that made him liable for support. The commissioner never indicated what finding of law made him liable to Denise.

97. Because the Plaintiff was not making payments through the child support

system, then he is obligated to be part of it. The Plaintiff never broke any state laws, nor did the court prove that the Plaintiff broke state law.

98. This Hearing now solidifies the unlawful taking of Plaintiff's property without just cause, and submitting the Plaintiff to a life of peonage.

99. When the Plaintiff received his permanent support order, The Honorable Martha Sackovich raised the Plaintiff's annual salary to $72,000 a year, almost double the base salary. With this salary, the Plaintiff would have to work 80 hours a week just to keep a roof over his head. All of this was done while "cloaked under the color of law." At the same time, the court guaranteed that the Plaintiff will never see his son regularly.

100. The reasoning behind this move was to assure that Denise would not suffer a "loss of support," but at the same time denying the Plaintiff life, liberty and freedom to make decisions concerning his child. The Family Court deliberately denied the Plaintiff the right to raise his child as he sees fit.

101. The Family Court of The State of Delaware regularly convicts non-custodial parents for non-support because they classify custodial and non-custodial parents differently, with no legitimate state purpose. Martha Sackovich and Christopher Spizzirri are another source of injury to the Plaintiff and causes for relief.

102. **13 Del C 701** - "The father and mother are the joint natural guardians of their minor child and are equally charged with the child's support, care, nurture, welfare and education. Each has equal powers and duties with respect to such child, and neither has any right, or presumption of right or fitness, superior to the right of the other concerning such child's custody or any other matter affecting the child. If either parent should die, or abandon his family, or is incapable, for any reason, to act as guardian of such child, then, the custody of such child devolves upon the other parent. Where the parents live apart, the court may award the custody of their minor child to either of them and neither shall benefit from any presumption of being better suited for such award."

103. Even though this law is in the Delaware Law Books, the State of Delaware applies the law differently toward custodial and non custodial parents.

104. Now that the Family Court of Delaware determined that the Plaintiff was absent from his child's life without stating a legitimate purpose, the Plaintiff decided to take further action.

105. On July 9, 2004, The Plaintiff made a phone call to the Director of Child Support Enforcement Office. The Plaintiff specifically requested to speak to Charles Hayward. His secretary refused to allow the Plaintiff to speak directly to Charles Hayward, but directed me to another representative of the agency.

106. The Plaintiff began to speak to the unidentified representative. He began to question her on why the Child Support Agency refused to give non-custodial parents

their due process rights. She explained that she does not practice law, and therefore could not answer the plaintiff's question. The Plaintiff explained that part of her job description was to protect the rights of both parents. It became evident that the Division of Child Support Enforcement did not understand how to perform their jobs.

107. The Plaintiff explained to the representative that the Social Security Act under Title IV-D requires that non-custodial parents are to be afforded the same equal protection as custodial parents, and that denial of those rights would mean that the agency would be violating a person's civil rights. The representative became irate and hung up the phone.

108. Unable to speak to Defendant Charles Hayward directly, the Plaintiff began to initialize written correspondence to address the denial of civil rights.

109. On July 10th and July 12th 2004, the Plaintiff mailed certified letters of Charles Hayward's office.

110. The first letter addressed the fact that The Division of Child Support Enforcement miscalculated the arrearages stated on the audit that was conducted on the Plaintiff's report and that the agency was circumventing their responsibility of investigating the facts on a child support petition before forwarding it to the Delaware Department of Justice.

111. The second letter further addressed The Division of Child Support Enforcement's failure to discover relevant information to discredit the Defendant Denise Lewis' claim that the Plaintiff failed to support his children as required by Title IV-D of the Social Security Act.

112. The Division acknowledged the fact that they overestimated the arrearages, but only after the Plaintiff requested The Federal Office of Child Support Enforcement Region 3 Office in Philadelphia, Pa. to intervene in his behalf. As far as the agency investigating the claims by their clients, Charles Hayward made this comment through this correspondence, dated July 27, 2004:

113. **" In your July 12, 2004 letter, you mention your concerns that the application submitted by the custodial parent was not fully investigated by DCSE. The information DCSE verifies on an agency application for services is done in numerous ways in accordance with the federal guidelines. As an example, when DCSE received the application from the custodial parent on your case, the first step was address verification. This verification was done through a postmaster letter as well as an information letter sent to your employer. This employer information letter requested address verification, as well as information regarding your work hours, salary and benefits............Once address verification was completed a support petition was prepared."**

114. A similar letter was mailed to Defendant Vincent P Meconi. This letter

was also sent via certified mail. It was dated July 25, 2004. The Plaintiff asked Vincent Meconi how they were able to accuse him of his failure to support without just cause and to forward such a claim to the Delaware Department of Justice without substantive proof. Here is his response:

**115. " In an attempt to better clarify the process, let me explain that DCSE's procedure for initiating a case for child support enforcement is no different than that of an individual who walks into the court and files a petition on his or her own. The individual filing the petition names the respondent and his or her current address. DCSE does the same when generating a petition for child support. The court then schedules a hearing and notices the parties. The hearing is the fact-finding venue, where the court gathers the evidence presented by the parties. The court then, based on the evidence presented, enters an order. An individuals right to due process.......comes during the court hearing.......paragraph 3 of the petition states "respondent has refused to or failed to comply with said duty without just cause." This is merely an allegation.......it is not meant to be a negative or discriminatory remark toward the respondent."**

116. A similar letter was sent to Governor Ruth Ann Minner dated July 27, 2004, but the Plaintiff did not receive a response. She left it up to Charles Hayward and Vincent P Meconi to settle the Plaintiff's questions.

117. The handbook on child support enforcement that was distributed by The Federal Office of Child Support Enforcement outlines the procedure for initiating child support petitions.

118. "The worker will verify the home and work addresses, then ask the non-custodial parent to come to the CSE office for an interview, or notify him/her that legal action may be taken." The Delaware Division of Child Support Enforcement does not follow these steps. They merely forward the application to the Delaware Department of Justice, who then files a civil summons through the Family Court for processing without ever giving the respondents the opportunity to contest.

119. The actions of the Defendants Hayward, Meconi, and the Honorable Ruth Ann Minner were a direct source of injury and causes for relief.

120. In August 2004, the Plaintiff submitted to the Family Court of the State of Delaware two petitions; a modification of child support and a Rule to Show Cause. The Rule to Show Cause Petition was filed so that the Family Court and The Division of Child Support can explain how they can process a child support procedure without any proof of lack of support.

121. The Rule to Show Cause pleading was ruled by Commissioner Mary Ann Herlihy. The Plaintiff originally had a court hearing scheduled for January 4, 2005. However, on October 26, 2004, the Commissioner ruled on the hearing without giving the Plaintiff the opportunity to appear.

122. Mary Ann Herlihy dismissed the claim stating that the Plaintiff did not state a cause of action. I immediately appealed this action by Commissioner Herlihy. In the appeal, the Plaintiff stated that Family Court rule 18 requires that the court hear every case brought to it.

123. On November 17, 2004, the appeal came before the Honorable Judge Jay H Conner. Again, the Plaintiff was denied his right to appear in court to present his case. Despite the fact that the Plaintiff was entitled to have his case heard by the family court, Judge Conner dismissed the case stating again that the Plaintiff did not state a cause of action; claiming that the Plaintiff's action for cause of relief is defective in many ways. After this latest dismissal, the Plaintiff ceased seeking justice through the Family Court.

124. By the actions of Judge Jay H Conner and Commissioner Mary Ann Herlihy, they denied the Plaintiff substantive and procedural due process of law. They also denied the Plaintiff equal protection of the law and are a source of injury and causes for relief. Perhaps if Judge Conner and Commissioner Herlihy read Foman vs. Davis, they would have heard the Plaintiff's Rule to Show Cause hearing:

**FOMAN vs. DAVIS**- 371 US 178 (1962) " The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits. The rules themselves provide that they are to be construed "to secure the just, speedy and inexpensive determination of every action." Rule 1...... Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded.......If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits........but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules."

125. On January 11th 2005, the Plaintiff and Defendant Denise Lewis appeared in the Family Court of the State of Delaware for mediation. The purpose of this mediation was for the modification of the child support payment. Unknowing at the time, Denise retained the services of Christine K Demsey, a family law attorney, and her former employer. The Family Court mediator proceeded to ask for the pay-stubs of the litigants. Upon receiving this information, she began to compile the support order. The plaintiff questioned the mediator about the Family Court Formulary. The mediator responded by saying that there was no such formulary. The Plaintiff opened his laptop computer and turned the screen toward the mediator. The Plaintiff asked if this was the Formulary that they were to use. She said yes. The Plaintiff requested that the Order be processed using the 40 hour work week.

126. The mediator compiled 4 orders; two based on a 40-hour week; two based on year to date income. The mediator asked the Plaintiff which formula would he

wish. The Plaintiff replied "40 hours as per guidelines."

127. Defendant Christine K Demsey replied, " No, we are not going to accept that. My client needs more money. Since you have been working overtime, your child needs more of your money."

128. The Plaintiff replied that the only reason why he was working overtime is because he has to in order that he doesn't lose his home. The Plaintiff is being forced to work beyond a normal week to satisfy the greed of her client.

129. The Plaintiff also warned Christine K Demsey that what she was attempting to accomplish was a direct violation of his rights and that she would be subject to further legal action outside of The Family Court of The State of Delaware.

130. She asked the Plaintiff was that a threat. The Plaintiff replied that it was not a threat, but it was a promise that he was going to deliver on and the Plaintiff also notified the Child Support representative and the mediator that he was not intimidated by their actions and that he was prepared to deal with this abuse of legal power head-on.

131. The Plaintiff asked to be excused from the meeting. The mediator granted his request.

132. Upon leaving the courthouse, the Defendants Denise Lewis and Defendant Christine K Demsey followed the Plaintiff.

133. Christine K Demsey introduced herself to the Plaintiff. She explained that the Plaintiff should not be upset with the proceeding. She explained that he needs to work as much as possible to support his son. "Your son needs your money," she said.

134. The Plaintiff replied, "The state and your client needs my money. I am not going to allow this court and you to continue to violate my rights as a parent. At first, I felt guilty about this situation. But now I have a clear conscience. The same way that you have taken action, I can also take action to acquire jurisdiction of you and this court. I have said what I had to say in court. Now it is time for me to take legal action to protect my rights. Why are you following me? Let me go in peace and let me do what I need to do. Have a nice day."

135. Defendant Christine K Demsey and Denise Lewis relished the fact that they can continue to use The Family Court of The State of Delaware, The Delaware Judiciary, and The Delaware Department of Justice to deny the Plaintiff his Constitutional Rights.

136. By the Defendants actions, the Plaintiff suffered a serious financial setback through no fault of his own.

137. The Plaintiff fell behind in his rent on two occasions; the second

incident resulted in the Plaintiff being locked out of his home by the New Castle County Delaware Constable for 24 hours.

138. The Plaintiff had his utilities turned off on two separate occasions; the second shutoff occurred during the week that the Plaintiff was not paid. The electric remained disconnected for over one week.

139. The Plaintiff fell behind with his car payments and almost had his car repossessed.

140. Because of the high child support payment, the Plaintiff is forced to work overtime, thus denying the Plaintiff the right to enjoy his son.

141. The Plaintiff's son is failing in school, but because of the State's interference, the Plaintiff is unable to spend time with his son to help him.

142. The Plaintiff was denied the right to raise his child as he sees fit. In fact, the State denied the Plaintiff the right to make decisions concerning the care and nurture of his own child without stating a legitimate purpose. The United States Courts have held the right of parents to raise their children as they see fit.

143. **Doe vs. Irwin**- 441 F Supp 1247 US DC of Michigan (1985) "The rights of parents to the care, custody and nurture of their children is of such character that it cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, and such right is a fundamental right protected by this amendment(first) and amendments 5,9 and 14."

144. **Wallace vs.Jaffree**- 472 US 38(1985) "The several states has no greater power to restrain individual rights than does the Congress."

145. **Reynolds vs. Baby Fold, INC.** 435 US 963 (1977) "Parent's right to custody of child is a right encompassed within protection of this amendment which may not be interfered with under guise of protecting public interest by legislative action which is arbitrary or without reasonable relation to some purpose within competency of state to effect."

146. **Quilloin vs.Walcott**- 434 US 246, 255-56 (1978) "The US Supreme Court implied that a married father who is separated or divorced from a mother and is no longer living with his child could not constitutionally be treated differently from a currently married father living with his child."

147. **Stanley vs. Illinois**- 405 US 645 (1972) " Procedure by presumption is always cheaper and easier than individualized determination. But, when as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risk running roughshod over the important interest of both parent and child. It therefore cannot stand."

148. The United States Supreme Court has made numerous rulings concerning the rights of Citizens to be free from unreasonable government interference.

149. **Weinberger vs. Weisenfeld-** 95 S Ct. 1225 (1975) " A father, no less than a mother, has a constitutionally protected right to the companionship, care, custody and management of the children he has sired and raised, which undeniably warrants deference and, absent a powerful countervailing interest, protection."

150. **Boyd vs. US** -96 S Ct. 984 (1976) It is the duty of the courts to be watchful for Constitutional Rights of the citizen, against any encroachments thereon."

151. **Smith vs.Organization of Foster Families** - 431 US 816 (1977) " We have little doubt that the Due Process Clause would be offended if a state were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without showing of some unfitness and for the sole reason that to do so was thought to be in the children's best interest."

152. In summary, the Defendants, all of them, have denied the Plaintiff the Constitutional Right to be free from unnecessary government intrusion.

153. Through the use of the Division of Child Support Enforcement, The Delaware Department of Justice, and the Family Court of the State of Delaware, the Defendants, all of them, caused the unlawful and unconstitutional taking of the Plaintiff's property without due process, thereby violating the Plaintiff's 14th amendment rights. This was done by establishing a temporary child support order, through wage attachment, without any finding of facts of law, or a due process hearing.

154. **Hutto vs. Davis** -454 US 370,375 (1982) " Decisions of the Supreme Court regarding federal law and the Constitution are binding on the lower courts. There is no room in our system for departure from this principle, for it were otherwise, the law would lose its coherence. The trial court is a court of equity and the parties, both men and women, must be treated equally and given their due process rights. The courts must, in equity, have compelling reasons to award more parental rights and control to one and not to the other."

155. Through the actions of Denise Lewis, Christine K Dempsey, The Division of Child Support Enforcement and the Delaware Department of Justice, the Plaintiff endured unconstitutional discrimination in the Family Court, therefore denying him equal protection of the law, and subjecting him to a life of a peon. Their actions also caused the Family Court to classify the Plaintiff as a "deadbeat parent," and subjecting him to bias and gender discrimination, without serving a legitimate government purpose. The US Supreme Court has ruled against such activity.

156. **Craig vs. Boren** - 429 US 190 (1976) "Classifications by gender must serve important governmental objectives and must be substantially related to

achievement of those objectives."

157. **Frontiero vs. Richardson**- 411 US 677 (1973) "Classifications based upon sex, like classifications based upon race, alienage or national origin are inherently suspect and must be subjected to strict scrutiny.......Any statutory scheme which draws a sharp line between the sexes, solely for the purpose of achieving administrative convenience, necessarily commands dissimilar treatment for men and women who are similarly situated and therefore involves the very kind of arbitrary legislative choice forbidden by the Constitution."

158. **Boddie vs. Connecticut**- 401 US 371 (1971) "Within limits of practicability, a state must afford to all individuals a meaningful opportunity to be heard...... Whenever one is assailed in his person or his property, that he may defend..... The right to a meaningful opportunity to be heard within limits of practicality must be protected against denial by particular laws that operate to jeopardize it for particular individuals."

159. **Dunn vs. Blumstein** - 405 US 330 (1972) " In pursuing substantial state interest, state cannot choose means which unnecessarily burden or restrict constitutionally protected activity."

160. **Roe vs. Wade** - 410 US 113 (1973) "Where certain fundamental rights are involved, regulation limiting these rights may be justified only by a compelling state interest and the legislative enactment must be narrowly drawn to express only legitimate state interest at stake."

161. **Cohen vs. Chesterfield County School Board** -  414 US 632 (1974)"There is a right to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child......"

162. **Communist Party of US vs. Subversive Activities Control Board** - 367 US 1,6 (1961) " The singling out of an individual for legislatively prescribed punishment constitutes a "bill of attainder" whether individual is called by name or described in terms of conduct, which, because of its past conduct, operates only as a designation of particular persons."

163. **Bailey vs. Alabama** -219 US 219 (1911) " Peonage is sometimes classified as voluntary or involuntary......The act of congress, nullifying all state laws by which it should be attempted to enforce the service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise........The 13th Amendment prohibits involuntary servitude except as punishment for a crime......The State may impose involuntary servitude as a punishment for a crime, but it may not compel one man to labor for another in payment of a debt, by punishing him as a criminal if he does not perform the service or pay the debt. What the State may not do directly it may not do indirectly. If it cannot punish the servant as a criminal for the mere failure or refusal to serve without paying his debt, it is not permitted to accomplish the same result by

creating a statutory presumption which, upon proof of no other fact, exposes him to conviction and punishment......it is apparent that it furnishes a convenient instrument for the coercion which the Constitution and the act of Congress forbid; an instrument of compulsion peculiarly effective as against the poor and the ignorant........ The act of Congress deprives of effect all legislative measures of any state through which, directly or indirectly, the prohibited thing, to wit, compulsory service to secure the payment of a debt, may be established or maintained........"

164. **Ex- Parte State of Virginia** - 100 US 339 (1879) "The constitutional provision, therefore, must mean that no agency of the state, or of the officers or agents by whom its powers are asserted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a state government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the state. This must be so, or the constitutional prohibition has no meaning. Then the State has clothed one of its agents with power to annul or to invade it."

165. The State of Delaware has a "proud history" of denying their citizens their Civil Rights as guaranteed by the United States Constitution.

166. The State of Delaware originally rejected the ratification of the Thirteenth Amendment, which made involuntary servitude unconstitutional. The United States Congress completed the ratification of this amendment on December 6, 1865, but the State of Delaware did not ratify it until February 12, 1901; 36 years later; making it next to the last state to accept the amendment (only Kentucky took longer, March 18, 1976).

167. The State of Delaware also originally rejected ratification of the Fourteenth Amendment, barring states from denying citizens their due process rights. The Congress completed ratification on July 9, 1868. The State of Delaware originally rejected it on February 8, 1867, but 34 years later, on February 12, 1901 the State of Delaware finally ratified this amendment. This proved to be disturbing to the Plaintiff. The Plaintiff became thoroughly convinced that The State of Delaware is still rejecting the Thirteenth and Fourteenth Amendments.

168. Today, the State of Delaware is rejecting the Thirteenth and Fourteenth Amendments under the auspices of the Child Support Enforcement Program under Title IV-D of The Social Security Act. They have systematically subjected their citizens to a life of peonage through abuse of the child support program.

169. The Division of Child Support Enforcement, through the Delaware Department of Justice, files a petition for child support based on allegations by the "custodial" parent stating that the "non-custodial parent" is "absent," therefore not providing support for the child(ren).

170. Instead of the Child Support Enforcement Agency verifying the accuracy of the allegations, they just simply forward the information to the Delaware Department of Justice for processing.

171. The Department of Justice forwards the petition to the Family Court for processing; without validating the information for accuracy.

172. The Family Court of Delaware issues a summons to the "non-custodial" parental alleging that the parent was not supporting his child, denying the respondent the option to contest the petition, and seizing his "property," his pay, without a due process hearing. The person that does the unlawful taking is not a judge, but a mediator, who is clothed under the authority of the law to deny the Plaintiff his fifth and fourteenth amendment rights. The mediators act through their own personal agendas, not by operation of law, because the law authorizes them to do so.

173. A civil right is an enforceable right or privilege which is interfered with by another gives rise to an action for injury. Discrimination occurs when the civil rights of an individual are denied or interfered with because of their gender.

174. The purpose of the State of Delaware denial of the Plaintiff's constitutional rights is to assure the continuation of Federal Financial Assistance of their Child Support Enforcement Program.

175. Federal financing is based upon the performance of the Delaware Division of Child Support Enforcement Program, which is based upon expenditures to amount of collections.

176. Collection amounts used are the amounts of "court orders", as reported to the Federal Government, which is used to determine the performance of a state plan for federal financial participation and incentive payments(bonuses), and to retain full Federal funding of Delaware's welfare program, and not necessarily the amount received from the payers and distributed to the families; in otherwords, the State of Delaware sets high child support orders and they do not necessarily have to receive all monies from those orders to benefit from Federal money.

177. The State of Delaware is using the children of its citizens as pawns to deprive the non-custodial parents their due process rights and to guarantee continuation of full Federal funding. They also accomplish this by setting temporary orders, thus immediately infusing more money that will become eligible for further Federal assistance. The Plaintiff or other litigants have no defense to protect their property.

178. A Pro-se litigant, like the Plaintiff, can contest the unconstitutional taking of his wages, but the court would use their rules to pumugate the Plaintiff by suppressing his testimony, thereby violating his rights to "effective counsel" and an "impartial judge," and assuring the continuation of Federal financial assistance.

179. The Defendants are able to accomplish their mission consistently thanks to the Delaware Ad Hoc Committee.

180. The Delaware Ad Hoc Committee was appointed by Chief Judge Vincent Poppitti to evaluate the child support guidelines as required by Title IV-D of the Social Security Act. This evaluation must be conducted every four years.

181. Some of the members of this Ad Hoc Committee include judges who not only write the rules; they sit on the Bench and rule on the rules they themselves wrote. They also hold power over pro-se litigants and attorneys that may have to argue against these rules to ensure "Due Process" for their clients, through the acceptance motion to practice law in that Judge's particular Court, which must be signed by that judge.

182. Some of the Judges of this Ad Hoc Committee are also Administrative Judges in their specific courts, thereby in charge of their courts, including hearing officers and other personnel, and procedures and "local rules of the court."

183. Attorneys and Pro-se litigants who may argue against the rationality or constitutionality of a "rule" that particular Judge wrote, have no chance ever in that court, for questioning the competency of a "rule", or lack thereof, while trying to ensure "due process", thereby violating that clause of the Fourteenth Amendment and the Sixth Amendment rights to "effective counsel" and an "impartial judge."

184. By taking these actions, the Ad Hoc Committee ensured that their rules will be "set in stone," thereby eliminating the "rebuttable presumption" as mandated by 45 CFR 302.56 and thereby assuring higher Federal Financial Participation.

185. Because of Ad Hoc Committee's actions, they have been able to achieve the highest "possible court orders," and they have been able to meet and exceed their financial windfall through the concise trail of conspiracy and deception.

186. The Ad Hoc Committee circumvents public scrutiny by having closed door meetings and deliberations; because of this, the public is not able to testify and observe the meetings. The dates of these meetings are never made public. These actions have kept the public from expressing their views, a right guaranteed by the First Amendment, and violating the the Administrative Procedure Act as codified, 5 USC 552b mandating open meetings with public notice in Federal Programs.

187. The Common working class, tax paying citizen has no voice in the laws that affect the most important aspects of their lives; their family, children, finances and future of their children through no fault of their own, thus denying them of their Fourth, Fifth, Ninenth and Fourteenth Amendment rights. In fact, they do not make the Child Support Formulary readily available to the public, thereby furthering the "protection" of Federal financial assistance.

188. The Family Court, in cooperation with the Delaware Department of Justice and under the direction of the Delaware Judiciary, obstructs and suppresses Pro-se litigants by denying them due process by making the court the least accessible as possible, making court procedures as difficult as possible, and they disseminate false and misleading information pertaining to the court and the operation thereof.

189. The Court classifies pro-se litigants differently than those represented, in violation of the equal protection clause of the Fourteenth Amendment.

190. The Family Court and the Delaware Division of Child Support Enforcement encourages the filing of child support petitions, thus ensuring the continuation of Federal Funds and assuring the protection of "custodial" parents and discriminating against "non custodial" parents, thereby encouraging adversarial relationships between parents.

191. The Family Court utilizes two types of financial reports. One of the reports, Rule 16c Financial Report, allows both litigants to list their income and their monthly expenses. The second report, Rule 16a, only list the incomes of the litigants. It does not allow expenditures to be listed. This would give the impression that both litigants do not have expenditures. This would put the non-custodial parent at a disadvantage because it would leave all of their income to be available for garnishment. It also allows the custodial parent to list excessive child care cost that the non-custodial parent cannot dispute, thus denying them equal protection. The Rule 16a Financial Report is only used for child support cases; thus establishing two classes of families though similarly situated if not the same. This is another example of how the State of Delaware discriminates between custodial and non-custodial parents. The Federal Government prohibits discrimination in federally assisted programs.

192. The Family Court personnel consist mostly of women. The Plaintiff observed that on January 11, 2005, the employees' names that were on each of the mediator rooms were women. In fact, the Plaintiff cannot recall observing any names of men employees listed on any of the conference rooms, leaving speculation that this was done intentionally by the court as another scheme to assure the highest possible source of income by establishing bias toward men. Surely, the women employees would be using their negative feelings toward men and promoting their own "feminism" thoughts and taking their feeling out on the men, instead of applying the law fairly and consistently, another example of denial of equal protection, and contrary to the Supreme Court decisions concerning preferential treatment for women.

193.**Orr vs.Orr** 440 US 268 (1979) "Legislative classifications which distributes benefits and burden on the basis of gender carry the inherent risk of reinforcing stereotypes about the proper place of women and their need of special attention; thus, even statutes purportedly designed to compensate for and ameliorate the effects of past discrimination against women must be carefully tailored. The State cannot be permitted to classify on the basis of sex."

194. **Craig vs.Boren** 429 US 190 (1976)" Classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives."

195. **Johnson vs. Robinson** 415 US 361 (1974) " A classification must be reasonable, not arbitrary, and must rest upon some ground of differences having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."

196. **Roe vs Wade** 410 US 113 (1973) " Where certain fundamental rights are involved, regulation limiting these rights may be justified only by a compelling state interest and the legislative enactment must be narrowly drawn to express only legitimate state interest at stake."

197. **Bigelow vs. Virginia** 421 US 809 (1975) " A State cannot foreclose the exercise of constitutional rights by mere labels."

198. **United States vs Brown** 381 US 303 (1946) " Legislative acts, no matter what their form, that apply either no named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."

199. Defendant Denise Lewis employed the services of Defendant Christine K Demsey to further suppress the Plaintiff's rights to raise his child as he sees fit. This is a desperate attempt to completely eliminate any participation by the Plaintiff in the decision making process of his child.

200. Christine K Demsey is a Special Master to the Family Court. She has held this position since 1994. This Defendant has the potential to harm the Plaintiff since her recommendations to the Family Court can be chosen as the best alternative over the objections of the Plaintiff. This is a tactic that Defendant Denise Lewis uses to try to seize total control of the Plaintiff's son therefore interfering with the Plaintiff's family, something the Supreme Court does not advocate.

201.**May vs. Anderson** 345 US 528- " The United States Supreme Court noted that a parent's right to the companionship, care, custody and management of his or her children is far more precious than any property right."

202. **In RE U.P.,648 P 2d 1364, Utah** (1982) " The right of a parent not to be deprived of parental rights without a showing of fitness, abandonment or substantial neglect is so fundamental and basic as to rank among the rights contained in this amendment(ninth) and Utah's Constitution."

203. The Defendants, all of them, have worked together to devise a plan of attack to deny the Plaintiff equal protection of the law by making false allegations

to The Division of Child Support Enforcement. The Delaware Child Support Enforcement, in cooperation with the Delaware Department of Justice and the Family Court coordinated a plan to deprive the Plaintiff his property before granting him a evidentiary hearing as required by the Seventh Amendment.

204. **Seventh Amendment-** " In suits at common law, where the value in controversy shall exceed twenty dollar, the right of trial by jury shall be preserved, and no fact tried by a jury shall otherwise re-examined in any court in the United States.........."

205. Once the property was seized from the Plaintiff, the Defendants successfully suppressed Plaintiff's rights in order to further their plan. They have successfully denied the Plaintiff the right to equal treatment, subjected the Plaintiff to Judicial discrimination because of his gender, denied the Plaintiff of life, liberty and the pursuit of happiness, enabled the government to unlawfully interfere with the nurture and care of his child, and subjected him to further legal harassment by the Family Court of The State of Delaware and The Delaware Department of Justice. In fact, the Defendants are planning to continue their attack on the Plaintiff by attending the child support modification hearing scheduled for June 6, 2005.

206. The Plaintiff hereby request that the United States Attorney General  subpoena the records and social files of all the litigants that were processed by the Family Court of the State of Delaware for violations of Civil Rights and violations of Federal Laws.

207. The Plaintiff also requests this Honorable Court to invoke the Constitution to prevent the furthering of the deprivation of Plaintiff's Civil Rights as guaranteed by the Fifth, Thirteenth and Fourteenth Amendments and to punish those Defendants that deprived the Plaintiff of his liberties and his reputation.

208. This Court has jurisdiction and the Plaintiff brings this Federal action to enforce his Constitutionally secured liberties, arising under 42 USC sections 1983,1985,1986, 1988 and 2000bb and as his civic duty as a United States and Delaware citizen.

209. The United States District Court has jurisdiction under the Civil Rights Act of 1866 and 1871 which was never repealed and clearly places the redress by citizens for deprivation of rights in Federal jurisdiction.

210. **28 USC 1343(a)** "The District Courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person.(1.) to recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of The United States by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42 (2) To recover damages from any person who fails to prevent or aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent.(3) To

Redress the deprivation, under the color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States(4)To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

211. **18 USC 641** " Whoever embezzles or knowingly converts to his use of another any money or any property being made under contract for the United States or any Department or Agency thereof; or whoever receives or retains the same with the intent to convert to his use or gain, knowing it to have been embezzled or converted."

212. **Santiago vs. City of Philadelphia** 435 F Supp 136- " I agree with the substantive standard announced by the Court today, imposing liability when a public-official defendant "knew or should have known" of the constitutionally violative effect of his actions. This standard would not allow the official who actually knows that he was violating the law to escape liability for his actions, even if he could not "reasonably have been expected" to know what he actually did know. Thus the clever and unusually well-informed violator of constitutional rights will not invade just punishment for his crimes.I, also agree that this standard applies "across the board," to all "government officials performing discretionary functions.", Harlow at 2739, Justice Brennan, Justice Marshall, and Justice Blackmun concurring.

213. " In Pierson vs. Ray 386 US 547, Mr. Justice Douglas, dissenting: " I do not think that all judges, under all circumstances, no matter how outrageous their conduct are immune from suit under 17 Stat.13, 42 USC Section 1983. The Court's ruling is not justified by the admitted need for a vigorous and independent judiciary, is not commanded by the common-law doctrine of judicial immunity, and does not follow inexorably from our prior decisions." at 558-559

214. " The Position that Congress did not intend to change the common-law rule of judicial immunity ignores the fact that every member of Congress who spoke to the issue assumed that the words of the statute meant what they said and that judges would be liable. Yet despite the repeated fears of its opponents, and the explicit recognition that the section would subject judges to suit, the section remained as it was proposed; it applied to "any person". There was no exception for members of the judiciary. In light of the sharply contested nature of the issue of judicial immunity it would be reasonable to assume that the judiciary would have been expressly exempted from the wide sweep of the section, if Congress had intended such a result." at 563

215. "We should, of course, not protect a member of the judiciary "who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good." at 564 "......the judge who knowingly turns a trial into a "Kangaroo" court? or one who intentionally flouts the Constitution in order to obtain a conviction? Congress, I think, concluded that the evils of

allowing intentional, knowing deprivations of civil rights to go un-redressed far outweighed the speculative inhibiting effects which might attend an inquiry into a judicial deprivation of civil rights .at 567. Judges are not immune for their non-judicial activities, i.e., activities which are ministerial or administrative in nature."

216. **Pierson vs. Ray** - 386 US 547 (1967) " When a judge acts intentionally and knowingly to deprive a person of his constitutional rights, he exercises no discretion or individual judgment; he acts no longer as a judge, but as a "minister" of his own prejudice.

217. **Gregoire vs. Biddle** 177 F.2d 579,581- "We should, of course, not protect a member if the judiciary "who is in fact guilty of using his power to vent his spleen on others, or for any other personal motive not connected with the public good."

218. **Fireman's Ins/ Co of Newark, NJ vs. Washburn County** 2 Wis. 2d 214, 85 N.W. 2d 840 (1957) "Government immunity violates the common law maxim that everyone shall have a remedy for an injury done to his person or property."

219. **Reed vs. Reed** 404 US 71,76 (1971) " Clearly the objective of reducing the workload on probate courts by eliminating one class of contest is not without some legitimacy.......but to give a mandatory preference to members of either sex over members of another, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of The Fourteenth Amendment" .......States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State."

220. **Monell vs. Department of Social Services of The City of New York** 436 US 658 (1978) "In addition, municipalities cannot have arranged their affairs on the assumption that they can violate constitutional rights for an indefinite period; accordingly, municipalities have no reliance interest that would support an absolute immunity. Finally, it appears beyond doubt from the legislative history of the Civil Rights Act of 1871 that Monroe misapprehended the meaning of the Act. Were 1983 unconstitutional as to local governments, it would have been equally unconstitutional as to state or local officers, yet the 1871 Congress clearly intended 1983 to apply to such officers and all agreed that such officers could constitutionally be subjected to liability under 1983. The Act also unquestionably was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights. Therefore, without a clear statement in the legislative history, which is not present, there is no justification for excluding municipalities from the "persons" covered by 1983.

221. " Municipal corporations in 1871 were included within the phrase "bodies politic and corporate" and accordingly the "plain meaning" of one that is that local government bodies were to be included within the ambit of the persons who could be sued under one of the Civil Rights Act. Indeed a Circuit Judge, writing in1873 in what is apparently the first reported case under one, read the Dictionary Act in precisely this way in a case involving a corporate plaintiff and a municipal defendant...........Local

governing bodies, therefore can be sued directly under 1983 for monetary, declaratory, or injunctive relief.........may be sued for constitutional violations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels..........Congress included customs and usages because of the persistent and widespread discriminatory practices of state officials......although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a custom of usage with the force of law."

222. It is my civic duty, as a citizen of the United States, and as a resident of the State of Delaware during all times relevant to this complaint, to request this Honorable Court to request the United States Attorney General to investigate and subpoena the "social files" of all litigants that have been involved with the Family Court of The State of Delaware, The State of Delaware Department of Justice, and The Delaware Judiciary, for Civil Rights and Constitutional Violations; and to invoke the sovereignty of the United States Constitution to prosecute to the fullest extent, those Defendants that have violated the Civil Rights of all that they have encroached. There existed too much collusion between all the Defendants throughout the history of this case which abridged the Plaintiff's rights as a US citizen and put the Plaintiff's child at risk.

## FEDERAL CAUSES OF ACTION

### COUNT ONE: VIOLATION OF 42 USC 1985

223. Plaintiff repeats and re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 222 above with the same force and effect as if herein set forth.

224. At all relevant times the conduct of the Defendants were subject to 42 USC 1985.

(2.) **Obstructing justice, intimidating party, witness, or juror** - If two or persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror on any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws;

(3.) **Depriving persons of rights or privileges**- If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of

persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in the furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

225. By reason of the conduct of the Defendants that obstructed justice as described within 42 USC 1985; intimidated a witness as described within 42 USC 1985; intimidated a witness as described within 42 USC 1985; and deprived the Plaintiff of Federal rights as described within 42 USC 1985, Plaintiff suffered harm, actual and consequential damages. Wherefore, Plaintiff demands judgment, including interest, severally and jointly against Defendants for actual, special, compensatory and punitive damages in an amount deemed at time of trial to be just, fair and appropriate.

## COUNT TWO: VIOLATION OF 42 USC 1983

226. Plaintiff repeats and re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 225 above with the same force and effect as if herein set forth.

227. At all relevant times the conduct of the Defendants were subject to 42 USC 1983- Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action of law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

228. The Defendants under color of state statute, regulation, custom, actions and usage deprived the Plaintiff of his rights, privileges and immunities secured by the Constitution and laws. Plaintiff suffered harm and actual and consequential damages. Wherefore, Plaintiff demands judgment, including interest, severally and

jointly against Defendants for actual, special, compensatory and punitive damages in an amount deemed at time of trial to be just, fair and appropriate.

## COUNT THREE: VIOLATION OF 42 USC 1981

229. Plaintiff repeats and re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 228 above with the same force and effect as if herein set forth.

230. At all relevant times the conduct of the Defendants were subject to 42 USC 1981:

(a.) **Statement of equal rights**
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exaction of every kind, and to no other.

(c.) **Protection against impairment**
The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.

231. The Defendants deprived the Plaintiff of his rights, privileges and immunities secured by the Constitution and laws. Plaintiff suffered harm and actual and consequential damages. As a direct result of the Defendants actions the Plaintiff was attacked intimidated, put into continuing anxiety and then processed devoid of protection or guaranteed civil liberties. The Plaintiff has suffered damages including, but not limited to, the aforesaid damages. Wherefore, the Plaintiff demands judgment, including interest, severally and jointly against Defendants for actual, special, compensatory and punitive damages in an amount deemed at time of trial to be just, fair and appropriate.

## COUNT FOUR: CIVIL RICO

232. Plaintiff repeats and re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 231 above with the same force and effect as if herein set forth.

233. The elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages that are a direct result of those acts.

234. In furtherance of their objective, Defendants did two or more predicated acts against the Plaintiff. Those overt acts include, but are not limited to the following: (a) meeting and writing a plan of action to tamper with the witnesses and evidence for the upcoming civil trial by using tactics of intimidation and fear; (b)

coordinating assaults made on the Plaintiff; and (c) enlisting and receiving agreements on a common goal by the respondent officers of the court.

235. The pattern was to make income and to benefit by circumventing Federal and State civil guarantees the Plaintiff had a right to. Wherefore, Plaintiff demands judgment, including interest, severally and jointly against Defendants for actual, special, compensatory and punitive damages in an amount deemed to be appropriate, just and fair.

## COUNT FIVE: VIOLATION OF 18 USC 241

236. Plaintiff repeats and re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 235 above with the same force and effect as if herein set forth.

237. At all relevant times the conduct of the Defendants were subject to 18 USC 241:

If two or more persons conspire to injure, oppress, threaten or intimidate any person in any State, Territory, Commonwealth, Possession or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway or in the premise of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured- they shall be fined under this title or imprisoned not more than ten years or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

238. The Defendants deprived the Plaintiff of his rights, privileges and immunities secured by the Constitution and laws. Plaintiff suffered harm and actual and consequential damages, Wherefore, Plaintiff demands judgment, including interest, severally and jointly against Defendants for actual, special compensatory and punitive damages in an amount deemed at time of trial to be just, fair and appropriate.

## COUNT SIX: VIOLATION OF 18 USC 1503

239. Plaintiff repeats and re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 238 above with the same force and effect as if herein set forth.

240. At all relevant times the conduct of the Defendants were subject to 18 USC 1503.